IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

IN RE:        BANKS AUTO PARTS, INC. and         Case No. 07-32884-KRH
              FANAPA USA, INC. and               Jointly Administered
              FANAPA, LLC,                       Chapter 11

                        Debtors.

_____

BANKS AUTO PARTS, INC. and
FANAPA, LLC,

                        Plaintiffs,

v.                                               APN 07-3155 and
                                                 APN 07-3156
BANKS INVESTMENTS I, LC,
OLANDER BANKS,
GREGORY BANKS and
RONALD BANKS,

                        Defendants.

_____

## <u>MEMORANDUM OPINION</u>

Before the Court are Motions to Dismiss filed by the defendants, Banks Investments I.,
LC ("Banks Investments"), Olander Banks, Gregory Banks and Ronald Banks, pursuant to Rule
7012 of the Federal Rules of Bankruptcy Procedure, incorporating Rule 12(b)(6) of the Federal
Rules of Civil Procedure (the "Motions").  Hearing on the Motions was held on January 2, 2008,
at which time the Court took the matters under advisement (the "Hearing").  For the reasons set
forth below, the Court will deny the Motions in part and grant the Motions in part.

Banks Auto Parts, Inc. and Fanapa, LLC (the "Plaintiffs") filed in this Court along with
their affiliate, Fanapa USA, Inc., Voluntary Petitions for Relief under Chapter 11 of the

Bankruptcy Code on August 9, 2007 (the "Petition Date").[1]  The Debtors remain in possession of their property and continue to operate and manage their businesses as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  On November 13, 2007, the Plaintiffs separately filed Complaints against Banks Investments, Olander Banks, Gregory Banks and Ronald Banks (cumulatively, jointly and severally as the context would suggest, the "Defendants").   The two Complaints are identical except that each has a different Adversary Proceeding Number.   The Debtors have advised the Court that they filed the two separate Complaints in order to differentiate between potential assets for Fanapa, LLC and Banks Auto Parts, Inc.  Counsel for the parties represented at the Hearing that the parties intend to have the two Adversary Proceedings consolidated.   Accordingly, the Court has considered the two Complaints (hereinafter the "Complaint") and the various Motions to dismiss the Complaint collectively for purposes of this Memorandum Opinion.

Counts I through V of the Complaint seek relief only against Defendants Banks Investments and Olander Banks.  Counts I, II, III and IV of the Complaint seek to avoid certain transfers and to preserve the avoided transfers for the benefit of the Debtors' respective estates. Count V of the Complaint seeks a declaratory judgment concerning property of the estate. Counts VI and VII of the Complaint seek relief only against Defendants Gregory Banks and Ronald Banks.  Count VI of the Complaint seeks turnover of property of the estate and Count VII of the Complaint seeks damages associated with the willful violation of the automatic stay of § 362 of the Bankruptcy Code.

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.   Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409.   These are core proceedings under 28 U.S.C. § 157(b)(2)(A), (E), (G), (H) and (O).

---

[1]  Banks Auto Parts, Inc., Fanapa, LLC, and Fanapa USA, Inc. are hereinafter referred to as the "Debtors."

The standard to be applied in ruling on motions to dismiss is well established.  The Court must accept all factual allegations in the complaint as true, construe the complaint in a light most favorable to the plaintiffs, and recognize that dismissal is inappropriate "unless it appears to a certainty that the plaintiff[s] would be entitled to no relief under any state of facts which could be proved in support of [their] claim[s]."  *Schnelling v. Crawford (In re James River Coal Co.)*, 360 B.R. 139, 153 (Bankr. E.D. Va. 2007) (citing *Baird v. Rose*, 192 F.3d 462, 467 (4th Cir. 1999); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 764 (4th Cir. 2003).

Olander Banks was the owner and operator of an auto salvage and parts business in Spotsylvania County known as Banks Auto Parts, Inc. ("Banks Auto Parts").  The Plaintiffs allege that on or about June 11, 2002, their affiliate, Fanapa USA, Inc. ("Fanapa USA") entered into a stock purchase agreement with Olander Banks for the acquisition of all of the stock of Banks Auto Parts (the "Stock Purchase Agreement").[2]  The Stock Purchase Agreement contemplated that Olander Banks would sell his auto salvage business and convey possession of the underlying real estate (the "Real Estate") upon which it was necessary for the business to operate.  The Stock Purchase Agreement also provided that there would be an option to purchase the Real Estate for $478,500.  As part of the Stock Purchase Agreement, Fanapa USA executed a promissory note payable to Olander Banks in the sum of $1,221,500 (the "Note") which represented the deferred purchase price for the stock.  The Stock Purchase Agreement and the Note were personally guaranteed by the principals of the Debtors and by Fanapa, LLC.  Also, as part of the Stock Purchase Agreement, Banks Investments entered into a six-year lease with

---

[2]  While the transaction is alleged to have occurred in June of 2002, the Court notes that the Stock Purchase Agreement and the other operative documents are dated February 20, 2002.

Fanapa, LLC for the Real Estate (the "2002 Lease")[3].  The 2002 Lease contained the option to purchase the Real Estate that was referenced in the Stock Purchase Agreement (the "Land Purchase Option").  The terms of the Land Purchase Option included an allocation for the rent paid by Fanapa, LLC into interest and principal components with the principal to be credited to the purchase price.

Fanapa, LLC attempted to exercise the Land Purchase Option in April of 2005.  The Complaint alleges that one or more of the members of Banks Investments decided that the Real Estate had significantly more value than the previously agreed price under the Land Purchase Option and decided that Banks Investments should do anything and everything to prevent the exercise of the Land Purchase Option.[4]  This included interfering with the Debtors' business operations and causing confusion concerning amounts that had been paid pursuant to the 2002 Lease.  Counts VI and VII allege that Gregory Banks and Ronald Banks in furtherance of this design intentionally interrupted the Debtors' business by among other things placing trash and debris on the Real Estate and by denying the Debtors access to a crushing machine[5] that was integral to the operation of the business of Banks Auto Parts.

Banks Investments responded to the exercise of the Land Purchase Option by commencing an unlawful detainer action against Fanapa, LLC on June 8, 2005.  Banks Investments alleged that Fanapa, LLC was in arrears for rent in the sum of $27, 825, interest, late

---

[3]  There is a dispute as to whether all of the Real Estate was owned by Banks Investments or whether a portion of the Real Estate was owned by Olander Banks.

[4]  It has been represented that the Real Estate is worth at least $3,000,000 whereas the purchase price under the Land Purchase Option is $478,500 not accounting for the rent payments made by Fanapa, LLC to date.  This would suggest that the Debtors had significant equity in the Land Purchase Option.

[5]  The crushing machine is alleged to have been owned by Banks Auto Parts.  It crushes automobiles into smaller sizes.  It is alleged that the crushing machine allowed the business to sell crushed vehicles as scrap metal and was integral to the operation of the business.  It is alleged that Gregory Banks and Ronald Banks assumed dominion and control of the machine.

fees in the amount of $4,372.50, and damages for "unpaid taxes and insurance," costs and reasonable attorney's fees in the sum of $47,133.54. Plaintiffs allege in the Complaint that none of these amounts were owed. Trial was set in the General District Court for Spotsylvania County (the "State Court") on August 17, 2005 (the "Trial Date"). The parties agreed to settle the litigation for $81,331.54 so long as Fanapa LLC paid Banks Investment "shortly after August 17, 2005" (the "Settlement Agreement"). Banks Investments was allowed to take judgment on the Trial Date in order to protect its interests in the event that Fanapa, LLC failed to perform under the Settlement Agreement. On August 20, 2005, Fanapa, LLC tendered a cashier's check to Olander Banks in the amount of $81,333.54. The cashier's check was accompanied by a letter stating that (i) the check "represented full and final payment of the debt owed to you by Fanapa, USA, Inc. and Fanapa LLC," (ii) the payment "brings us current, and we are authorized to continue our Lease at 8901 Jefferson Davis Highway, Spotsylvania, Virginia, as provided in the [2002] Lease," and (iii) the [2002] Lease remains in full force and effect, including our ability to exercise the [Land Purchase Option]" (the "Tender of the Settlement Proceeds"). The cashier's check was accepted and negotiated by "Olander Banks and/or Banks Investments" (the "Consummation of the Settlement"). Plaintiffs refer to the Settlement Agreement, the Tender of the Settlement Proceeds and the Consummation of the Settlement as the "Accord and Satisfaction."

Notwithstanding the Accord and Satisfaction, Olander Banks and/or Banks Investments made demand in September or October 2005 for an additional payment of $75,075. Olander Banks and/or Banks Investments caused a writ of possession to be issued against Fanapa, LLC and demanded that unless it received the additional $75,075 and unless Fanapa, LLC signed a new lease, Plaintiffs would be "thrown out" of the premises. Faced with the prospect of eviction,

Plaintiffs delivered a second cashier's check to Olander Banks, this one in the amount of $80,000.  The check was tendered with a cover letter that said that $75,075 of the check was to be applied to the new amount claimed due and the balance of the check in the amount of $4,925 was to be applied as a deposit on the Land Purchase Option.  The cover letter clearly denoted that "[t]his deposit exercises my option to purchase the [Real Estate]."  Olander Banks accepted the tender of the $80,000 check, negotiated the check and deposited the proceeds.  A third cashier's check in the amount of $15,000 was tendered along with the $80,000 check.

On October 14, 2005, Olander Banks advised the Debtors that if Fanapa, LLC would sign a new lease, the Debtors (i) would be permitted to remain in possession of the Real Estate and (ii) would be permitted to consummate their exercise of the Land Purchase Option.  Thereafter, the Debtors were presented with a new lease that was backdated to September 1, 2005 (the "2005 Lease").  Debtors were induced to sign the 2005 Lease based upon the representation that they would have to do so in order for Fanapa, LLC to consummate its prior exercise of the Land Purchase Option.  Mr. Torrico signed the 2005 Lease for Fanapa, LLC.  While Defendants point out that the 2005 Lease did not include a purchase option for the Real Estate, the 2005 Lease is silent as to the Debtors' prior attempts to exercise the Land Purchase Option.  Despite the receipt of the $80,000 cashier's check, the recitations in the accompanying cover letter, the negotiation of the checks without any reservation of rights, and the representations of Olander Banks about the continued right of the Debtors to consummate their prior exercise of the Land Purchase Option, Olander Banks and Banks Investments thereafter denied Fanapa, LLC its rights to the Land Purchase Option.  Instead a new unlawful detainer action (the "Second Unlawful Detainer Case") was commenced in April of 2006.

These bankruptcy cases were commenced shortly after the State Court entered summary judgment in favor of Banks Investments in the Second Unlawful Detainer Case on July 23, 2007. As the State Court made no findings of fact or conclusions of law, no transcript of the proceedings exists, and multiple alternative theories had been plead by Banks Investments, it is impossible to ascertain the basis for the State Court's decision.  As such, counsel for the Defendants conceded that the State Court ruling was not *res judicata* with regard to the issues before this Court.  Of course, the counts arising under § 548(a)(1)(B) of the Bankruptcy Code were never considered or addressed by the State Court.

In Count I of the Complaint, the Plaintiffs assert that the termination of the 2002 Lease and the termination of the Land Purchase Option by the August 17, 2005 unlawful detainer judgment and the writ of possession are avoidable transfers under § 548(a) of the Bankruptcy Code.  The Plaintiffs first assert that the transfers were made with the actual intent to hinder, delay or defraud the creditors of Banks Auto Parts and Fanapa, LLC and, therefore, are avoidable under 11 U.S.C. § 548(a)(1)(A).  Plaintiffs next assert that Banks Auto Parts and Fanapa, LLC received less than reasonably equivalent value in exchange for the transfers, and, therefore, the transfers are avoidable under 11 U.S.C. § 548(a)(1)(B).

The Defendants argue in response that the causes of action under § 548(a) are barred because the statute of limitations has expired.  The response posited by the Defendants raises an affirmative defense under Bankruptcy Rule 7008(a).  "A motion [to dismiss] is intended to test the legal adequacy of the complaint, and not to address the merits of any affirmative defenses.  In the limited circumstances where the allegations of the complaint give rise to an affirmative defense, the defense may be raised [by a motion to dismiss], but only if it clearly appears on the

face of the complaint." *Schnelling*, 360 B.R. at 157.  The Defendants bear the burden of proof

on all factual issues raised in support of the affirmative defense.

Section 548(a) allows the trustee[6] in a case to avoid transfers made within two years prior

to the Petition Date under either of the two circumstances alleged by the Plaintiffs.   The

Defendants argue that the transfers occurred on the date that Banks Investments sent notice to

Fanapa, LLC that the 2002 Lease was terminated for nonpayment of rent.  As that notice was

sent on May 13, 2005[7] and as the Petition Date occurred on August 9, 2007, Defendants contend

that the statutory period within which an avoidance action under § 548(a) may be commenced

has expired.

There are two distinct interests in property that are the subject of alleged avoidable

transfers.  The first is the estate for a term of years in the Real Property as set forth in the 2002

Lease.  The second is the Land Purchase Option that is recited in both the 2002 Lease and the

Stock Purchase Agreement.  The nature of the Debtors' interest in the 2002 Lease and in the

Land Purchase Option is governed by state law.  Issues involving the transfer of those property

interests are questions of federal law.[8]  *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 369–70, 65

S.Ct. 405, 407–08, 89 L.Ed. 305 (1945).

---

[6]  Section 1107 of the Bankruptcy Code provides that the debtors in possession have all the rights and powers of a trustee serving in a case under Chapter 11.

[7]  In support of this fact, Defendants attached an affidavit to their Motion to Dismiss that purported to a include the May 13, 2005 notice as Exhibit A.  However, the exhibit was inadvertently omitted.  Plaintiffs argued that if the Court were to consider the Affidavit, then the Motion to Dismiss must be converted to a motion for summary judgment under Federal Rule of Civil Procedure 56.  Defendants respond by arguing that the affidavit is not essential to their position because it is undisputed that the Unlawful Detainer Action was commenced on June 8, 2005.  They contend that a judgment and a writ of possession could not have been obtained from the State Court unless the notice had been sent before the case was commenced.  Therefore, they conclude that the notice must have been issued more than two years before the Petition Date.  The Defendants also attached the notice of termination to a subsequent pleading.

[8]  The term transfer as employed in the Bankruptcy Code is an extremely broad concept.  It includes each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an interest in property.  An involuntary disposition of the Debtors' property interests in either the 2002 Lease or the Land

As a general matter, a lease for a term of years terminates at the end of the time-period set forth in the lease. However, a lease may call for an earlier termination date in the event of a breach of the lease. *See Marina Shores, Ltd. v. Cohn-Phillips, Ltd.*, 246 Va. 222, 226, 435 S.E.2d 136, 138 (1993). The Defendants cite the *Patterson* case to support their assertion that in such an event the mere giving of notice has the effect of terminating the lease. *Patterson v. National Advertising Co.*, 213 Va. 562, 565, 193 S.E.2d 676, 678 (1973). Defendants argue that the 2002 Lease terminated upon their delivery of notice of default to Debtors and that such delivery of notice is the operative date for determining when the transfer occurred.

In the *Patterson* case, however, the court found that there were grounds to terminate the lease. *Id.* at 565, 193 S.E.2d at 678.[9] Plaintiffs, in this case, dispute that Fanapa, LLC was in breach of the 2002 Lease. In their Complaint, the Plaintiffs allege (and for purpose of this Motion the Court must accept as true) that the Debtors were current on their rent when Defendants claimed that the Debtors were not paying their rent when due. Plaintiffs contend that, if there did not exist a default under the 2002 Lease when Defendants attempted to terminate the 2002 Lease, then the notice (no matter how clear or unequivocal it may have been) was ineffective to terminate the 2002 Lease. Plaintiffs contend that their allegations raise factual disputes over whether there existed a default under the 2002 Lease. Plaintiffs argue that this issue of material fact prevents the Court from adjudicating Count I on the Motion to Dismiss.

---

Purchase Option would constitute a transfer within the meaning of the Bankruptcy Code. *See* 11 U.S.C. § 101(54)(D).

[9] When the parties prescribe different rules in their lease, "neither the common-law rules on the subject of what a landlord must do to terminate a lease because of nonpayment of rent nor the statute in Virginia on the subject have any application. The subject is governed and controlled in the case . . . by the express contract of the parties and by the action of the lessor in accordance therewith." *Jabbour Bros. v. Hartsook*, 131 Va. 176, 108 S.E. 684, 687 (1921). There may be material issues of fact presented in this case as to what the parties had agreed would constitute a termination of their lease. The copy of the 2002 Lease attached to the Plaintiffs' Complaint does state that the tenant's right to possession terminates upon an event of default of the lease. The right to possession would terminate in the event of a breach. However, there is a factual dispute in this case as to whether the Debtors actually defaulted under the 2002 Lease.

Assuming that the 2002 Lease did terminate upon the delivery of notice of default, the resulting termination is not necessarily the equivalent of a transfer for purposes of the Bankruptcy Code.  Even after the May 13, 2005 notice was delivered, the Debtors still enjoyed rights with regard to the Real Property that had not been extinguished.  Under § 548 of the Bankruptcy Code, a transfer is not completed until everything necessary to accomplish the transaction has transpired.  Completion of a transfer is captured for purposes of the Bankruptcy Code by the concept of perfection.  A transfer is not made until it is "so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee."  11 U.S.C. § 548(d)(1).  If the transfer is not perfected before the commencement of a case, then the transfer is deemed to have been made immediately before the date of the filing of the petition.  11 U.S.C. § 548(d)(1).

Plaintiffs contend that the actions taken by the Defendants following their alleged termination of the 2002 Lease did not clearly and unambiguously establish their intent to end the 2002 Lease.  Instead, Plaintiffs allege that Defendants entered into the Settlement Agreement, accepted tender of the Settlement Proceeds, and Consummated the Settlement Agreement.  In this context, Plaintiffs allege that the Defendants agreed to waive any alleged default that may have occurred under the 2002 Lease in consideration of the payment of $81,333.54 by Plaintiffs.  Accordingly, Plaintiffs argue that the 2002 Lease was not effectively terminated in May of 2005.  They contend that termination occurred later in October 2005 when Defendants obtained the writ of possession or when the State Court entered the first unlawful detainer judgment on August 17, 2005.  Both of those events occurred within the two-year period preceding the Petition Date.

The Debtors remained in possession of the Real Estate after the alleged notice of termination was given, and they continued to do so two years after the 2002 Lease allegedly was terminated. Plaintiffs allege that they later delivered an additional $80,000 cashier's check with a cover letter dated October 14, 2005, stating how those funds were to be apportioned between the 2002 Lease and the Land Purchase Option. Under the totality of these circumstances, there appear to be questions whether the transfer of the 2002 Lease occurred upon the delivery of the notice allegedly terminating the 2002 Lease or whether it occurred at some later time.

With respect to the Land Purchase Option, Plaintiffs allege that it was exercised by the letter dated April 30, 2005.[10] Plaintiffs allege that because the Real Estate had significantly appreciated in value, Defendants sought to "do anything and everything to prevent the exercise of the Land Purchase Option." It was in response to the exercise of the option that the May 13, 2005 notice of termination of the 2002 Lease was delivered. Once Fanapa, LLC exercised the option, it became contractually obligated to purchase the Real Estate. At that point, Fanapa, LLC became vested with equitable title in the Real Estate. That equitable title could not be eliminated by giving the purchaser notice to quit. Once the option was exercised, Defendants could not continue the relationship of lessor and lessee and willfully refrain from conveying the Real Estate according to their obligation to do so. They were precluded at that point from creating a breach of the covenant to pay rent in order to enable them to declare a forfeiture of the option. *See In re Devlin*, 185 B.R. 376, 377 (Bankr. M.D. Fla. 1995); *Guido v. Township of Sandy*, 584 Pa. 93, 101, 880 A.2d 1220, 1225 (2005); *Park W. Village, Inc. v. Avise*, 714 P.2d 1137, 1141 (Utah 1986); *Schwarting v. Schwarting*, 354 N.W.2d 706, 708 (N.D. 1984); *Pittman v. Sanditen*, 626 S.W.2d 496, 498 (Tex. 1982); *Young v. Cities Serv. Oil Co.*, 33 Md. App. 315,

---

[10] Paragraph 25(b) of the 2002 Lease provides that the "Tenant shall exercise its option by giving written notice to Landlord of its intent to exercise its option. Upon the giving of such notice, it shall be irrevocable and Tenant shall be obligated to purchase the Premises for the Purchase Price."

321, 364 A.2d 603, 607 (Md. Ct. Spec. App. 1976); *Cities Serv. Oil Co. v. Viering*, 404 Ill. 538, 554–55, 89 N.E.2d 392, 402 (1949); *Moore v. Maes*, 214 S.C. 274, 52 S.E.2d 204, 208 (1949); *Mauzy v. Elliott*, 146 Neb. 865, 873, 22 N.W.2d 142, 146 (1946) (stating that after lessee exercised an option to purchase, landlord could not keep alive the relationship of landlord and tenant for the purpose of creating a breach of covenant based upon failure to pay rent in order to afford an opportunity to forfeit the lessee's option rights); *Behr v. Hurwitz*, 90 N.J. Eq. 110, 114, 105 A. 486, 488 (1918); *Central Funding, Inc. v. Compuserve Interactive Serv., Inc.*, No. 02AP-972, 2003 WL 22177226, at *11 (Ohio Ct. App. Sept. 23, 2003).   Under Virginia law, after a tenant exercises the purchase option under the lease, "the relationship of the parties change[s] from landlord/tenant to vendor/purchaser.  The lease cease[s] to exist and [becomes] a contract for sale." *Exxon Corp. v. Rowe*, No.LL-55-4, 1987 WL 488749, at *2 (Va. Cir. Ct. Oct. 29, 1987) (citations omitted).  *See also Hornbeck v. Downham Inv. Co.*, No. 11005, 1988 WL 619143, at *3 (Va. Cir. Ct. March 1, 1988).

If the facts at the trial of this matter show that the Land Purchase Option was not exercised in April of 2005, that the Debtors did not become vested with equitable title at that time, and that the Debtors had breached the 2002 Lease, there would still remain questions of fact whether the breach of the 2002 Lease terminated the Land Purchase Option.  Termination of a purchase option "depends largely upon the intent of the parties in entering into the agreement – whether they intended that the option should form a part of the lease contract and whether the fulfillment of the covenants of the lease by the lessee was intended to constitute at least a part of the consideration for the option."  *Mitchell v. Wayave*, 185 Va. 679, 688, 40 S.E.2d 284, 288 (1946) (citations omitted).  The intention of the parties is a question of fact.  The Land Purchase Option is referenced not only in the 2002 Lease but also in the Stock Purchase Agreement.  The

Land Purchase Option was not merely common and indivisible consideration for the 2002 Lease. It was part of the consideration given for the overall transaction to purchase the business.  Under the circumstances presented here, it is not clear from the face of the Complaint that the Land Purchase Option was intended to terminate upon a default under the 2002 Lease.[11]  Therefore, even if Defendants are correct in their allegation that the 2002 Lease was breached, it does not necessarily follow that the Land Purchase Option was eliminated as a result thereof.

Courts look to "whether the lessor had manifested an intent to terminate the lease or has waived the breach." in determining whether a purchase option is destroyed by the termination of the lease.  *Id.* (citations omitted).  There is a factual dispute as to whether any alleged breach was waived by the parties' Consummation of the Settlement Agreement.  Elimination of the Land Purchase Option is inconsistent with Defendants' acceptance of the check from the Debtors that accompanied the October 14, 2005 letter stating that the Land Purchase Option was being exercised.  The subsequent acquiescence of the Defendants presents a myriad of factual issues that cannot be resolved as a matter of law on the face of the Complaint.  As there exist factual issues in dispute concerning the nature of the interests that were transferred as well as the time and manner in which the transfers occurred, the Court cannot grant the Defendants' Motion as to Count I of the Complaint based upon the affirmative defense that the two-year statute of limitations has expired.

Next, the Defendants seek to have Counts I and III dismissed because they allege that avoiding the transfer of the Land Purchase Option does not serve the purposes behind § 548 of the Bankruptcy Code.  Causes of action under § 548 exist, they contend, to preserve "the

---

[11]   The 2002 Lease attached to the Plaintiffs' Complaint does not state that the tenant's right to exercise the Land Purchase Option terminates upon an event of default under the lease.  The Stock Purchase Agreement, however, suggests that the Land Purchase Option would exist separate and apart from the Lease.

debtor's estate for the benefit of its unsecured creditors." *Harmon v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 485 (4th Cir. 1992) (citations omitted). The Defendants claim that Fanapa, LLC's schedules only list Olander Banks and Banks Investments as unsecured creditors.  Therefore, they conclude that the avoidance of the 2002 Lease would not benefit any of the Plaintiffs' unsecured creditors.  The Plaintiffs respond that Edward F. Whelan, III and Cleremont Office, LLC are undersecured creditors because they are secured only by Fanapa, LLC's interest in the Real Estate.  Plaintiffs argue that avoiding the transfer of the 2002 Lease would benefit not only these creditors but also the creditors of the other jointly administered estates.  Whether the avoidance of the transfer of the 2002 Lease would benefit the Plaintiffs' bankruptcy estates is a question of fact.  The Court cannot grant Defendants' Motion as to Counts I and III of the Complaint based upon Defendants' assertion that there are no unsecured creditors who will benefit from the avoidance action.

Defendants argue next that the Plaintiffs' claims under § 548(a)(1)(A) of the Bankruptcy Code and under § 55–80 of the Code of Virginia must be dismissed because Plaintiffs fail to allege that they possessed the requisite intent under these statutes.[12]  Under both § 548 of the Bankruptcy Code and § 55–80 of the Code of Virginia, a court looks to the intent of the grantor, not the transferee, in determining whether a transfer was made with the intent to hinder, delay, and defraud creditors.  *See Schnelling*, 360 B.R. at 161; *In re Porter*, 37 B.R. 56 (Bankr. E.D.

---

[12]  Count I of the Plaintiffs' Complaint seeks to avoid the alleged termination of the 2002 Lease by the General District Court of Spotsylvania County in granting the unlawful detainer judgment and the writ of possession under, among other theories, § 548(a)(1)(A) of the Bankruptcy Code.  Count III of the Plaintiffs' Complaint also relies upon § 548(a)(1)(A) to avoid the termination of the 2002 Lease that may have occurred by Fanapa, LLC's signing the 2005 Lease.  Section 548(a)(1)(A) gives a trustee in bankruptcy the power to avoid a transfer made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . . indebted."

Count II of the Plaintiffs' Complaint seeks avoidance of the unlawful detainer judgment and writ of possession under § 544(b) of the Bankruptcy Code.  Count IV seeks to avoid the termination of the 2002 Lease through Fanapa, LLC's and Banks Auto Parts' entering into the 2005 Lease through § 544(b).  That Section allows trustees to avoid any transfers that were avoidable under state law by unsecured creditors.  Virginia Code § 55-80 renders void any transactions made "with intent to delay, hinder or defraud creditors."

Va. 1984) (looking at the intent of the transferor in determining whether there was fraudulent intent).  It is undisputed that neither the Plaintiffs nor the State Court (the alleged transferors) possessed fraudulent intent in the termination of the 2002 Lease.  The Plaintiffs seek to impute the alleged fraudulent intent of the Defendants to the transferors.  In support of their argument, the Plaintiffs cite several cases, all of which involve imputing the fraudulent intent of those in control of a debtor company to the debtor company.  *See Moore v. Grasso (In re Formaggio, Mfg., Inc.)*, 23 B.R. 688, 691 (Bankr. D. R.I. 1982) (imputing fraud where the debtor's president transferred the corporation's funds to himself); *Langan v. First Trust & Deposit Co.*, 293 N.Y. 604, 59 N.E.2d 424 (1944); *In re Cushman Bakery*, 526 F.2d 23 (1st Cir. 1975) (refusing to extend the *Langan* rule); *Duberstein v. Werner*, 256 F. Supp. 515 (E.D.N.Y. 1966).  Here, the Defendants were never in control of the Plaintiffs' business.  They were not insiders of the Debtor.  Based upon the facts and allegations presented in this case, the Court declines to extend current law to allow imputation of a grantee's fraudulent intent to the grantor when the grantee is not in control of the corporate debtor.

To the extent that the Plaintiffs rely upon § 548(a)(1)(A) in Counts I and III of their Complaint, those claims will be dismissed.[13]  Counts II and IV of the Complaint will be dismissed outright, as they are entirely reliant upon establishing the grantor's fraudulent intent.

In Count III of their Complaint, the Plaintiffs assert that the 2002 Lease and the Land Purchase Option were revived or allowed to continue despite the unlawful detainer judgment by virtue of the Accord and Satisfaction.[14]  The Plaintiffs claim that Banks Investments and/or Olander Banks agreed to allow the 2002 Lease and the Land Purchase Option to continue if

---

[13]  To the extent that the Plaintiffs rely upon § 548(a)(1)(B) of the Bankruptcy Code in Counts I and III of their Complaint, those counts are not dismissed.

[14]  Because the Court has already determined that dismissal of Count IV would be appropriate, it need not address the Defendants' statute of frauds argument as to that count.

Fanapa, LLC paid $81,331.54 to Olander Banks and/or Banks Investments.  Plaintiffs call this

transaction the Settlement Agreement.  In support of this allegation, the Plaintiffs attached a copy

of a letter and a check to their Complaint.  The letter stated that the attached check represented

full payment of all amounts due to Olander Banks, and that this would allow Fanapa USA and

Fanapa, LLC to continue with the 2002 Lease.  Plaintiffs describe the delivery of the letter and

the check as the Tender of the Settlement Proceeds.  Plaintiffs allege that Defendants accepted

the tender of the letter and the check and that they negotiated the check.  Plaintiffs refer to this as

the Consummation of the Settlement Agreement.

Plaintiffs allege that later, when additional demands were raised by Defendants, Plaintiffs

delivered a cashier's check in the amount of $80,000 to Defendants with a cover letter dated

October 14, 2005.  The cover letter provided that $75,075 of the $80,000 check was to be applied

to the 2002 Lease (suggesting that it had not terminated as of that date) and the balance was to be

applied as a deposit toward the purchase of the Real Estate.  This check was accepted and

negotiated as well.  Plaintiffs provided an additional cashier's check in the amount of $15,000.

The Plaintiffs allege that this also was an accord and satisfaction of any prior debt under the

2002 Lease.

The Defendants have raised in response to this asserted settlement the affirmative defense

of the statute of frauds.  Fed. R. Bankr. P. 7008(a) (incorporating Fed. R. Civ. P. 8).  The Court

can only dismiss Count III if the facts necessary to prove the affirmative defense are clear from

the face of the Complaint.  *Schnelling*, 360 B.R. at 157.

The statute of frauds renders unenforceable a contract for the purchase of land or for the

lease of real property for more than one year "[u]nless a promise, contract, agreement,

representation, assurance, or ratification, or some memorandum or note thereof, is in writing and

16

signed by the party to be charged or his agent." Va. Code. Ann. § 11–2.  The statute of frauds

exists "to prevent the setting up of pretended agreements and then supporting them by perjury."

*Reynolds v. Dixon*, 187 Va. 101, 106, 46 S.E.2d 6, 8 (1948).  The statute seeks to prevent fraud.

It does not require that the entire contract be in writing, but that the writing relied upon to satisfy

the statute contain the essential terms of the contract and the signature of the party to be charged.

*Id*.  In the sale of real property, the writing must contain "the names of the parties, the terms and

conditions of the contract, and a description of the property sufficient to render it capable of

identification."  *Id*. at 108, 46 S.E.2d at 9 (citations omitted).  Defendants argue that where a

purported contract "that constitutes [an] accord is predicated upon the existence of an oral

modification" to a written contract that itself is subject to the statute of frauds, the claim of

accord and satisfaction is fatally flawed.  *Lindsay v. McEnearney Assoc., Inc.*, 260 Va. 48, 54,

531 S.E.2d 573, 576 (2000).

Plaintiffs respond that there has been no modification made to any contract.  There has

only been an agreement to waive certain disputed, alleged defaults and an agreement to continue

with the contracts on their original terms and conditions.  Plaintiffs contend that the prerequisites

for cancellation of the Land Purchase Option had never been met.  The parties agreed to settle

their disputes in consideration of the $81,331.54 payment, the $80,000 payment, and the $15,000

payment.  *Mitchell*, 185 Va. at 680–89, 40 S.E.2d at 284–889 (holding that where a lessor took

no final and unequivocal action to terminate the lease but rather recognized that the option still

existed, lessee upon substantial performance of the required conditions and upon furnishing the

required compensation is entitled to specific performance of the option).  Plaintiffs conclude that

the statute of frauds has no bearing on the allegations raised in Count III.

If, however, the statute of frauds can be asserted as an affirmative defense to the Accord and Satisfaction, courts have held that an endorsed check may be sufficient to satisfy the statute of frauds if the check contains the essential terms of the contract. *See Cousbelis v. Alexander*, 315 Mass. 729, 54 N.E.2d 47 (1944); *Harper v. Battle*, 180 N.C. 375, 104 S.E. 658 (1920). *But see Thompson v New South Coal Co.*, 135 Ala. 630, 34 So. 31 (1903).[15] Here the front portion of the $81,334.54 check that was attached to the Complaint contains none of the terms of the contract and does not have the endorsement of any of the Defendants. Because the Court has not been given the back of the check, it is unclear if the necessary information was provided on that portion of the check. That is a question of fact that cannot be resolved from the face of the Complaint. Thus, the Defendants have not demonstrated the facts necessary for the Court to rule in favor of their affirmative defense as a matter of law.[16]

Even if the $81,334.54 check did not set forth all of the contract's essential terms, the check together with the cover letter may be considered one document to satisfy the statute of frauds because of their relationship to one another.[17] The Supreme Court of Virginia has held that several letters and writings may be used to satisfy the statute of frauds, but "the letters and writings of themselves must show their relation to the contract. If the court cannot ascertain from the letters themselves, or from some other writing therein referred to, the essential terms of

---

[15]  In one case, the Circuit Court of Virginia for Frederick County held that while checks could be sufficient to satisfy the statute of frauds, the checks in that case failed to provide a sufficient description of the property. *Trenary v. Nichols*, No. 4338, 1985 WL 306770, at *1–*3 (Va. Cir. Ct. March 6, 1985).

[16]  The Plaintiffs attached the reverse side and the front side of the $80,000 check to the Complaint. This check does contain the language "Jose Torrico, 8901 Jeff Davis Hwy, Deposit Purchase 5,000" and the endorsement of Olander Banks. The check may be sufficient to satisfy the statute of frauds as to that transaction.

[17]  Physical attachment between the letter and the check accompanying it may be enough to have them treated as one document for purposes of the statute of frauds. Some courts have held that physical attachment is not enough to have two documents treated as one for purposes of satisfying the statute; they must show on their faces that they relate to one another. *See Douglass v. Texas-Canadian Oil Corp.*, 141 Tex. 506, 509, 174 S.W.2d 730, 731 (1943). In *Reynolds*, the Supreme Court of Virginia appears to have looked to both the envelope and the letter contained inside of the envelope to determine whether the property description was sufficient to satisfy the statute of frauds. *Reynolds*, 187 Va. at 102 –08, 46 S.E.2d at 6–10.

the contract, the writing does not take the case out of the statute." *Rahm v. Klerner*, 99 Va. 10,

37 S.E. 292, 293 (1900).  "However, the signed paper does not have to refer to the other paper as

such if it appears the other paper and nothing else is being referred to in the signed paper, and

parol can be used to make such identification. . . .  'The weight of authority is that the signed

paper . . . must refer to the unsigned paper in clear and distinct terms, but that it is not necessary

to refer to it *eo nomine*; but parol evidence is admissible to identify it if the reference to it is

sufficiently clear to exclude the idea that any other paper can be referred to.'"  *Trenary v.*

*Nichols*, No. 4338, 1985 WL 306770, at *2 (Va. Cir. Ct. March 6, 1985) (citing *Darling v.*

*Cumming*, 92 Va. 521, 524, 23 S.E. 880, 880 (1896)).  This is entirely consistent with the

Restatement (Second) of Contracts §132 which states that a "memorandum may consist of

several writings if one of the writings is signed and the writings in the circumstances clearly

indicate that they relate to the same transaction."  Comment (a) to that Section notes that explicit

incorporation by reference is unnecessary but, if extrinsic evidence is required to show a

connection, then that connection must be proved by clear and convincing evidence.  Because the

reverse side of the $81,334.54 check is missing, factual issues remain as to the sufficiency of the

writing.[18]

If the Court were to find that the $81,334.54 check contained the essential terms of the

contract or that the check and letter together contained the contractual terms necessary to satisfy

the statute of frauds, the Plaintiffs still must prove that the party to be charged signed the check

with an intention of authenticating the document.  *Falls v. Virginia State Bar*, 240 Va. 416, 397

S.E.2d 671 (1990).  This is clearly a question of fact that the parties have not addressed because

---

[18]  The $80,000 check may have sufficient information on its face for the Court to consider it as one document with
its cover letter for purposes of satisfying the statute of frauds.

the back portion of the check is missing so that it is unclear whether the check was signed at all.[19]

As there are questions of fact as to the information contained on the $81,334.54 check and as to the relation of the cover letter to the check, the Court must deny the Defendants' Motion as it relates to Count III of the Complaint based upon the affirmative defense that the Accord and Satisfaction failed to comply with the statute of frauds.[20]

In Count V of the Complaint, the Plaintiffs seek a declaratory judgment that:

(a)     Banks Auto Parts has a possessory interest in Parcel #1 and the 6 Acre Lot to which the automatic stay of 11 U.S.C. § 362(a) applies;

(b)     Fanapa, LLC has a leasehold interest in Parcel #1 and the 6 Acre Lot to which the automatic stay of 11 U.S.C. § 362(a) applies;

(c)     The 2002 Lease is in full force and effect; and

(d)     Fanapa, LLC has the right to exercise the Land Purchase Option.

To the extent that the request for declaratory relief set forth in Count V depends upon Counts I and III of the Plaintiffs' Complaint, Count V survives as to the claims in those counts that survive.  To the extent that Count V pertains to Counts II and IV of the Complaint, those claims will be dismissed.

In Counts VI and VII of the Complaint, the Plaintiffs allege that Gregory and Ronald Banks, through their asserting control over the Plaintiffs' crushing machine and placing trash and debris on the Plaintiffs' leased premises, have willfully violated the automatic stay created by

---

[19]  The $80,000 check was signed by Olander Banks, but it remains a question of fact whether the check was signed with an intention to authenticate the document.

[20]  Because the Court has determined that there are factual disputes as to whether the statute of frauds is satisfied, the Court need not make a definitive determination at this point in the proceeding whether the Accord and Satisfaction constituted a modification of the contract or whether any such modification, if it did occur, was significant enough to bring it under the umbrella of the statute of frauds in the first instance.

§ 362(a) of the Bankruptcy Code and must be forced to turnover an asset of the estate pursuant to §§ 542(a), 550, and 551 of the Bankruptcy Code.  Banks Investments and Olander Banks sought dismissal of Counts VI and VII of the Complaint because these counts sought relief only as to Gregory and Ronald Banks.  Based on the foregoing, the Court has decided that only Gregory and Ronald Banks need to respond to and defend Counts VI and VII of the Complaint.

Olander Banks seeks dismissal of the first five counts of the Complaint as to him, claiming that he was not the initial transferee of any of the fraudulent conveyances that the Plaintiffs seek to avoid.  It is not clear from the face of the Complaint that Olander Banks was not the initial transferee of the fraudulent conveyance of the Land Purchase Option or that he did not have at least a partial ownership interest in any of the Real Estate.  Thus, the Court cannot dismiss Counts I through V as to Olander Banks except to the extent that those counts were dismissed as to all of the Defendants.

Ronald and Gregory Banks seek to have Counts I through V of the Complaint dismissed as to them because they are not the transferees of the property that was allegedly fraudulently conveyed.  The Court agrees that the first five counts of the Plaintiffs' Complaint do not state a cause of action against Ronald and Gregory Banks.  Thus, Ronald and Gregory Banks need not respond to or defend Counts I, II, III, IV, and V of Plaintiffs' Complaint.

A separate order shall issue.

ENTERED:  _____

_____/s/ Kevin R. Huennekens_____
UNITED STATES BANKRUPTCY JUDGE

Copies to:

Lynn L. Tavenner
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, VA  23219

Paula S. Beran
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, VA  23219

Donald F. King
Odin, Feldman & Pittleman
9302 Lee Highway, Suite 1100
Fairfax, VA  22031